UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR. 10-40064 |
| Plaintiff, | \* | |
| vs. | \* | REPORT AND RECOMMENDATION |
| | \* | (Motion to Suppress, Doc. 13) |
| TERRI DUNKELBERGER, | \* | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending is Defendant's Motion to Suppress Statements (Doc. 13). A hearing was held on Thursday, October 21, 2010. Defendant was personally present and represented by her counsel of record, Mr. Jason Adams. The Government was represented by Assistant United States Attorneys Jeffrey Clapper and Amy Koopman. United States Department of Labor investigator Sandra Pons and Defendant Terri Dunkelberger testified at the hearing. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED.**

## JURISDICTION

Defendant is charged in an Indictment with Embezzlement and Theft of Labor Union Funds in violation of 29 U.S.C. § 501(c). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated March 18, 2010.

## FACTUAL BACKGROUND

As will become apparent, Sandra Pons and Terri Dunkelberger tell widely divergent versions of the March 25, 2010, meeting in Sioux Falls. Each witness's version of events is recounted below, followed by the Court's analysis of the credibility of each.

**Sandra Pons**

Ms. Pons is an investigator for the Department of Labor. She is based out of Minneapolis. TR 4. Her job responsibilities include conducting compliance audits of labor organizations. *Id.* Her territory includes South Dakota. TR 5. She met with Terri Dunkelberger on March 5, 2010, in Minneapolis and March 25, 2010, in Sioux Falls. She had previous contacts with Terri throughout the years regarding other matters. *Id.*

On March 5, 2010, Sandra met with Terri in Sandra's office in Minneapolis. The case began with a subpoena for records. Terri responded to the subpoena and brought the records to Minneapolis. TR 6. They were mostly financial records. *Id.* Sandra went over the records with Terri and asked her questions about the records in a conference room. The meeting lasted about two hours. Terri advised the union had an office in Sioux Falls, and the women agreed to meet in Sioux Falls on March 25, 2010, to further review records. TR 7. The March 5 meeting was primarily about the union's record-keeping procedure. TR 8.

The March 25 meeting occurred at the Labor Temple in Sioux Falls. Sandra Pons, Dan LaFond (a senior Department of Labor Investigator), and Terri Dunkelberger attended the March 25 meeting. TR 8. Sandra and Dan participated equally in the interview. TR 14. The interview began at about 2:00 p.m. TR 14. Other persons were present in the Labor Temple but not in the conference room. TR 18. The door to the conference room was closed but not locked. TR 18-19. Terri arrived in her own vehicle before Sandra and Dan arrived. TR 9. The union's office is in a large room in the Labor Temple basement. *Id.* Sandra advised Terri she was free to leave the meeting. Sandra cannot remember exactly when she advised Terri she was free to leave, but it was during the first part of the interview. TR 17. It is standard procedure to tell subjects they are free to leave. TR 9. Sandra did not advise Terri she had a right to an attorney or that she had a right to

remain silent; she does not customarily give the *Miranda* warnings. TR 15. Sandra advised her they had some questions about the records that had already been turned over. Terri also brought additional records. TR 10. Sandra advised Terri that some members of the union believed Terri had stolen union funds. *Id.* Sandra challenged Terri's answers, but did not yell at Terri. *Id.* The conversation remained cordial. TR 17. The interview began with questioning, but eventually turned to the members' accusations that Terri had stolen funds. Terri became tearful and had a shaky voice, but Sandra does not recall Terri crying. TR 16. The interview lasted approximately two hours. TR 14.

Sandra advised Terri that she would like to prepare a written statement. EX 1. Sandra indicated Terri could review the statement and make changes. This occurred about mid-way through the interview. TR 11. Terri left the room for a short time. *Id.* Sandra believed Terri was probably going to use the restroom so Sandra waited a few moments before she went to the restroom. TR 43. As Sandra typed**,** she asked Terri questions. TR 11. Sandra read the statement out loud to Terri before she printed the statement. *Id.* Sandra told Terri to make changes if she wanted to. *Id.* Terri expressed concerns about being able to read it, so Sandra printed it in a large font. TR 44. Terri did not express concerns about being able to read it after it was printed. *Id.* After the statement was printed, Terri read and signed it. TR 11, 44. The statement acknowledged that Terri had been free to leave, and in fact did leave the interview for a short period. EX 1. Sandra did not make any threats or promises to Terri. TR 13. Neither she nor Investigator LaFond told Terri if she signed the statement "this is over." TR 17-18, 45. LaFond has never used that tactic. TR 45. Sandra and Dan were not going to supper after the interview, they met with someone else. TR 46.

Sandra was dressed in business attire. TR 13. She did not carry a weapon. Sandra does not have the power to arrest people, and Terri was not arrested at the end of the interview. *Id.*

**Terri Dunkelberger**

Terri Dunkelberger was employed by Sioux Falls Transit at the time of the events which form the basis of these charges. TR 21. She was also the financial secretary of her union. *Id.* She received a subpoena to bring records to Minneapolis. TR 22. The tone of the first meeting in

3

Minneapolis was "good." *Id.* Sandra Pons made no accusations at that time. TR 23. Terri understood that Sandra needed to review the records, and they would review them during the later meeting in Sioux Falls. *Id.* It was scheduled for March 25, 2010. *Id.* Terri had met with a different investigator before, and that meeting was very pleasant. The investigator was very helpful and told her how to improve her record keeping. TR 41.

The March 25 meeting lasted about four hours. It was starting to become evening when she left. TR 23. The meeting began just like the meeting in Minneapolis. TR 24. About a half hour into the meeting, Sandra accused Terri of stealing from the union. *Id.* When the accusations began, Sandra and Dan both moved closer to Terri in the conference room. *Id.* The door to the conference room was closed. TR 25. She did not feel free to leave. *Id.* Sandra did not tell her she was free to leave. *Id.*

Sandra did not tell her the investigators did not have the power to arrest her. TR 31. Sandra never told her anything she said could be used against her later or that she had the right to have an attorney present. TR 26. When Terri went to the bathroom, Sandra also went to the bathroom. *Id.* Sandra and Terri went back to the conference room at the same time. TR 26. Terri was afraid Ms. Pons would hear her use her phone if she called for help. TR 25. Terri never asked to leave or use the phone. TR 34 Sandra did not threaten Terri, but Sandra was angry. TR 27. Sandra raised her voice. *Id.* Sandra did most of the talking. TR 28. Mr. LaFond talked about her phone records in an angry tone. The environment was hostile. TR 27.

Mr. LaFond threatened to go to the media if Terri did not sign the statement. She thought if she signed the document the incident would be over. Mr. LaFond told her if she signed the document it would all be over with, it would all go away. TR 29. He complained about her making him go through all the trouble of going through her phone records if she did not sign this document, and he wanted to go to supper. TR 28. Nobody mentioned being prosecuted. TR 29. She agreed to things in the statement that were lies just to make it go away. TR 36. She told them at the time it was all "crap." TR 35. She denied taking money from the union. TR 27. She signed the document because the government told her to. She trusted them because they are the government and she did not think they would lie. TR 37.

4

Terri was crying most of the time. TR 27. She had mascara in her eyes and could not see very well. *Id.* She has glaucoma in both eyes. TR 27. She did have her glasses with her but they did not help. TR 28. She could not read the document. TR 29. She could see parts of it. *Id.* She does not remember making any changes to the document. TR 38. Sandra read parts of the document out loud from the computer screen but left parts out. Mr. LaFond told her to write the handwritten part on the bottom. She does not know why. TR 30. She does not have to see to write. TR 40. She signed it even though it is not true. TR 39. She signed it under penalty of perjury but told them it was all "crap." She did not think she would get in trouble for signing the document because they told her to sign it and if the government tells you to do something you better just do it. TR 39-40.

## DISCUSSION

**Burden of Proof**

"It is settled that the burden is on the defendant to establish that the evidence was unlawfully obtained. The government's only burden in admitting a confession into evidence is to show by a preponderance of the evidence that the confession was given voluntarily." *United States v. Guerrero-Herrera,* 590 F.2d 238, 242 (7th Cir. 1978)(citations omitted). *See also, United States v. Bad Hand*, 926 F.Supp. 891, 899 (D.S.D. 1996).

**1.     Credibility**

Ms. Dunkelberger's version of events is wholly incredible. It defies belief that two trained government investigators would travel from Minneapolis, Minnesota to Sioux Falls, South Dakota to interview a person for two to four hours, after spending other time to review records and to investigate the union's claim that Dunkelberger had embezzled over $20,000, only to promise that if Dunkelberger signed a written statement "it would all go away."

It is equally unbelievable that a person who is adamant she has been wrongfully accused of embezzling from her union would, under penalty of perjury, sign a statement which admits that she **did** wrongfully take money "just to get it over with." If, as Ms. Dunkelberger insists, it was "all

5

crap" it is not believable she would have signed the document (1) without reading it;[1] and (2) admitting wrongdoing. It is not believable that Ms. Dunkelberger could have left the March 25 meeting with the understanding that her signature on the document would resolve the matter without any further consequences. Finally, Mrs. Dunkelberger both signed her statement under penalty of perjury and testified at the hearing under oath. She said in her written statement everything was true. At the hearing she said everything in her statement was crap. One way or the other she violated her word. Either way her credibility is destroyed.

### 2. Ms. Dunkelberger's Statements Were Not Custodial

"Law enforcement officials must administer *Miranda* warnings whenever they interrogate persons in their custody." *United States v. Brave Heart,* 397 F.3d 1035, 1038 (8th Cir. 2005) (citations omitted). A person is in custody when he is formally arrested or his freedom of movement is restrained to a degree equivalent with formal arrest. *Id.* To determine whether a person is in custody, the Court looks to the totality of the circumstances confronting the defendant at the time of questioning. The determination is based on the objective circumstances of the interrogation rather than the subjective views harbored by either the officers or the person being questioned. *Id.* The only relevant inquiry is whether a reasonable person in [Ms. Dunkelberger's] position would have felt at liberty to end the interrogation and leave. *Id.* at 1038-39.

For many years, the Eighth Circuit relied on the various indicia of custody defined *in United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). They are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the

---

[1] Ms. Dunkelberger's claim that she signed the statement without reading it or that Ms. Pons only read part of the statement to her is not credible. In any event, Ms. Dunkelberger presented no authority, and none has been found, to support the argument that a written statement, signed by the suspect, should be suppressed because the suspect failed to read it before signing. Rather, the only case which has been found where such a claim was made indicates that such an argument should go to the weight and credibility of the written statement, not its admissibility. *See United States v. Blankenship*, 548 F.2d 1118, 1120 (4th Cir. 1976). In *Blankenship,* the admissibility of the written confession was apparently not at issue, but the confession was admitted into evidence by the prosecution. The defendant took the stand and admitted he signed the document, but claimed he never read it before signing.

suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

In *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the *Griffin* factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. *Id.* at 826. *See also*, *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) ("an explicit assertion that the person may end the encounter . . . generally removes any custodial trappings from the questioning."). Nonetheless, the *Griffin* factors still appear in Eighth Circuit case law after *Czichray*, and continue to be cited with approval for determining the custody issue. *See e.g. United States v. Plumman*, 409 F.3d 919, 923 (8th Cir. 2005); *United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006); *United States v. Elzahabi*, 557 F.3d 879 (8th Cir. 2009).

Applying these principles, Mrs. Dunkelberger was not in custody during the March 25, 2010, interview. It has already been determined that Ms. Dunkelberger's version of the events is not credible. Ms. Pons is a credible witness. Pons told Ms. Dunkelberger she could leave the interview. Ms. Dunkelberger conceded during the evidentiary hearing that she did not, during the interview, ask to leave or to use her phone. There was no evidence presented indicating Ms. Dunkelberger's freedom of movement during the interview was restrained in any way. The door to the conference room was closed but not locked. Both Ms. Dunkelberger and the interviewers moved about during the interview–getting up and leaving the room at least once to use the restroom. Ms. Dunkelberger did not initiate the contact with Pons and LaFond, but she did voluntarily acquiesce in their request to meet on March 25. She voluntarily arrived at the meeting place on her own for the prearranged meeting. No strong-arm tactics or deceptive stratagems were used. The atmosphere was not police dominated. Although Pons and LaFond are both government agents, neither was in uniform or carried badges and the meeting occurred on Dunkelberger's "turf" at the

union office in the Labor Temple in Sioux Falls. Finally, Dunkelberger was not placed under arrest at the end of questioning. She was not arrested until June 4, 2010, after she was indicted on these charges.

### 3. Ms. Dunkelberger's Statements Were Voluntary

The Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined . . .'" *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct 1612, 1617, 48 L.Ed.2d 1 (1976)(citations omitted). Therefore, Ms. Dunkelberger's statements may still be suppressed even though they were made in a noncustodial setting if the statements were not voluntarily made.

"In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998). The Court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." *Id*. Also, "[p]olice coercion is a necessary prerequisite to a determination that a waiver was involuntary . . . " *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998). In other words, "personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the state.'" *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987)(citations omitted). Finally, "[c]oercive official activity is a necessary predicate to a finding that a statement is not voluntary. The Fifth Amendment privilege against self-incrimination is not concerned with other types of psychological pressures. An incriminating statement is not involuntary unless extorted from the accused by means of coercive activity." *United States v. Goudreau,* 854 F.2d 1097, 1099 (8th Cir. 1988)(citations omitted).

Applying these principles, Ms. Dunkelberger's statements were voluntary. There was no evidence of any physical threats or coercion during the interview. No improper coercive tactics

were used. No threats were made. The officers did not deceive Ms. Dunkelberger. The interview was not particularly long (between two and four hours ). Ms. Pons explained that she told Ms. Dunkelberger she was free to leave. The investigators were of course obligated to observe Ms. Dunkelberger's Constitutional rights, but they were not obligated to try to talk Ms. Dunkelberger out of confessing. "There is nothing inherently wrong with efforts to create a favorable climate for confession." *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993)(citations omitted).

The police tactics in *Simmons v. Bowersox*, 235 F.3d 1124 (8th Cir. 2001) were much more coercive than anything presented in this case,[2] and the Court found the statement was nonetheless voluntary. There is no support in the record to conclude the officers acted in a threatening, coercive or overreaching manner. At most, they were persistent. Ms. Dunkelberger's statements were voluntary and should not be suppressed.

## CONCLUSION

For the reasons more fully explained above, it is respectfully recommended to the District Court that Defendant's Motion to Suppress (Doc. 13) be **DENIED.**

---

[2]In *Simmons*, the suspect was only seventeen years old, was a poor student of below average intelligence, was interrogated by three police officers for over two hours, the officers were in close proximity to him and raised their voices at him, misrepresented to him that his accomplice was confessing, told him he was facing the death penalty, and told him "things would go better for him" if he told the truth.

9

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)

Dated this 26th day of October, 2010.

BY THE COURT:

s/John E. Simko
_____
John E. Simko
United States Magistrate Judge