UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 10-40064-01-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER ADOPTING |
| vs. | ) | MAGISTRATE JUDGE'S |
| | ) | REPORT AND |
| TERRI DUNKELBERGER, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

Defendant, Terri Dunkelberger, is charged with one count of embezzlement and theft of labor union assets in violation of 29 U.S.C. § 501(c). Dunkelberger moves to suppress a written statement that she signed during an interview with two Department of Labor investigators, Sandra Pons and Dan LaFond. The court referred Dunkelberger's motion to Magistrate Judge John E. Simko pursuant to 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Simko recommended that this court deny Dunkelberger's motion to suppress. Dunkelberger objects to three of Magistrate Judge Simko's factual and legal findings. The government had no objection to Magistrate Judge Simko's report and recommendation. After a de novo review of the report and recommendation and a review of the record, the court adopts the report and recommendation and denies Dunkelberger's motion to suppress.

**STANDARD OF REVIEW**

Under 28 U.S.C. § 636(b)(1), "when a party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, '[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (quoting 28 U.S.C. § 636(b)(1)); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

**BACKGROUND**

Dunkelberger served as the financial treasurer of her union, the Amalgamated Transit Union Local 1356 in Sioux Falls, South Dakota. As treasurer, her job duties included maintaining the Union's financial records. In February of 2010, the United States Department of Labor (DOL) received information from the Union that Dunkelberger failed to report how she was spending the Union's money.

Through a subpoena, the DOL requested that Dunkelberger meet with Pons in Minneapolis, Minnesota, on March 5, 2010. Dunkelberger attended this meeting and handed over the Union's financial records as requested in the DOL's subpoena. When the meeting ended, Pons and Dunkelberger

agreed to meet again on March 25, 2010, at 2 p.m. in the Union's office in Sioux Falls, South Dakota.

On March 25, 2010, Pons and LaFond, Pons's supervisor, drove to the Union's office in one car. Dunkelberger drove to the office in her own vehicle. The meeting took place in the Union's office, located in the basement of the Temple Union building. The Union also shares this space with the bricklayers' union. The office contained filing cabinets that stored the Union's financial records. During the two- to four-hour meeting, Dunkelberger was not given a *Miranda* warning and was not told that she could have an attorney present. Pons and LaFond did not record the conversation other than by summarizing the discussion in a written statement that Dunkelberger signed under penalty of perjury at the end of the meeting.

The office door was closed but not locked during the meeting. At various points in the meeting, other people were in the Temple Union building. Pons and LaFond were dressed in business causal attire. They did not carry handguns or handcuffs, nor did they ever claim that they could arrest Dunkelberger. Pons told Dunkelberger that she was free to leave during the meeting.

About thirty minutes into the meeting, Pons and LaFond told Dunkelberger that they believed she had stolen the Union's funds. During

the meeting, Pons and LaFond neither yelled at Dunkelberger nor threatened her.

At the end of the conversation, Pons told Dunkelberger that it was their usual practice to type up a written statement and have the interviewee review and sign the statement. Before Pons began typing the statement, Dunkelberger asked to use the restroom. Dunkelberger left the room and went to the restroom. Pons also had to use the restroom. She waited a few moments and then left to use the same restroom as Dunkelberger. When Dunkelberger walked back to the room, Pons walked behind her.

When Dunkelberger and Pons were back in the Union office, Pons began typing the statement on the laptop that she had brought with her. LaFond stepped out of the room during this process to use the phone. While typing the statement, Pons asked Dunkelberger clarifying questions. When Pons finished typing the statement, LaFond returned to the Union office, reviewed the statement, and suggested changes. Pons then read the statement aloud to Dunkelberger. Dunkelberger suggested a few changes, which Pons made. Pons then printed the statement on a portable printer that she had brought with her. The statement was in larger print than Pons usually used and had spacing of one-and-a-half lines because Dunkelberger earlier stated that she has problems seeing well.

Dunkelberger had the statement in front of her for some time and appeared to be reading the statement. Pons gave Dunkelberger a pen and told her to make any necessary changes. Dunkelberger initialed in the space indicated for initials on each page. At the end of the statement, Dunkelberger signed her name on the line indicated and wrote out three handwritten lines.

When Dunkelberger asked what was going to happen next, LaFond told her that he and Pons would prepare a report and that Dunkelberger's signed statement would be given to the United States Attorney's Office. After Dunkelberger signed the statement, Pons and LaFond left in one car to attend another meeting and Dunkelberger left in her own vehicle.

The top of the signed statement stated that "I, Terri Dunkelberger, . . . make the following voluntary statement . . . I understand that I am free to leave the interview, and left the interview for a few minutes." In the signed statement, Dunkelberger admitted to taking Union funds without authorization and that she was willing to repay approximately $20,000 in missing funds and cell phone charges for personal cell phone calls made by her and her mother. Dunkelberger was later arrested and charged with embezzlement and theft of labor union funds.

At the evidentiary hearing, Dunkelberger testified that the statement and the allegations against her were "crap" and that she only signed the

statement because LaFond told her that if she wanted to leave by supper and if she wanted the situation to be over, Dunkelberger should sign the statement. Dunkelberger admitted that she signed the statement under penalty of perjury, but she testified that the statement was inaccurate.

**DISCUSSION**

**I.    Dunkelberger's Credibility**

Dunkelberger first objects to the finding that her testimony at the evidentiary hearing was "wholly incredible." Magistrate Judge Simko found Dunkelberger's testimony incredible because it made no sense that Pons and LaFond would travel to Sioux Falls after spending numerous hours reviewing the case file and records only to promise that if Dunkelberger signed the statement that "it would all go away." He also found it unbelievable that a person who was accused of embezzling funds from her Union would sign a statement under penalty of perjury admitting that she wrongfully took the money "just to get it over with." Dunkelberger signed the statement under penalty of perjury and testified at the evidentiary hearing under oath. When she signed the statement, she agreed that everything in it was true. But at the hearing, Dunkelberger testified that everything in the statement was "crap." Magistrate Judge Simko found that because one way or the other Dunkelberger violated her word, her credibility was destroyed.

Dunkelberger raises two concerns regarding Magistrate Judge Simko's credibility determination. First, the interrogation was not recorded even though Pons and LaFond brought a laptop and portable printer to the meeting. Second, that Magistrate Judge Simko chose to believe Dunkelberger over Pons because he did not believe LaFond would tell Dunkelberger to sign the statement to "make it go away."

Dunkelberger first argues that "[i]nterestingly" Pons and LaFond brought a laptop but did not record the conversation. Dunkelberger fails to cite any authority holding that the Fifth or Fourth Amendment requires federal agents, especially those that do not have the power to arrest, to record conversations with subjects of criminal investigations. To the court's knowledge, no such authority exists. Accordingly, Dunkelberger's argument that the court should find her credible because the DOL agents failed to record the conversation is unpersuasive.

Dunkelberger next argues that Magistrate Judge Simko incorrectly accepted Pons over Dunkelberger as a credible witness regarding whether LaFond coerced Dunkelberger to sign the statement. Dunkelberger admits that neither Pons nor LaFond ever threatened her during the interview, rather she argues that the coercion came when LaFond told her that everything would go away if she signed the statement. Pons's testimony directly contradicts this assertion.

Pons and LaFond had been investigating this case from at least February of 2010 when a Union member complained about mismanagement of Union funds. They met with Dunkelberger on March 5, 2010, in the DOL's Minneapolis office. At that meeting, the parties agreed to meet again on March 25, 2010. Pons and LaFond informed Dunkelberger that they would prepare a written statement of the interview and give that statement to the United States Attorney's Office for further investigation. Given the DOL's on-going investigation and involvement of the United States Attorney's Office, it would be nonsensical for LaFond to promise Dunkelberger that if she signed the statement that the entire investigation would "go away."

Moreover, Dunkelberger signed the statement under penalty of perjury that the statement contained the truth. But at the hearing, she testified that the whole investigation was "crap." Dunkelberger's conflicting sworn statements raise serious doubts as to her credibility. Given the totality of the circumstances, the court agrees with Magistrate Judge Simko's report and recommendation that Dunkelberger is not credible.

## II. Dunkelberger Was Not In Custody

For her second objection, Dunkelberger argues that she was in custody when she signed the statement. Magistrate Judge Simko found that Dunkelberger was not in custody when she signed the statement because

Pons told her that she could leave the interview, Dunkelberger voluntarily agreed to meet the agents, she left the interview room once, no strong-arm tactics were used, the atmosphere was not police-dominated, the door to the interview room was closed but not locked, and the agents did not place Dunkelberger under arrest after the questioning.

Dunkelberger objects to these findings and argues that she was never told that she was free to leave and that she never felt free to leave, especially after Pons followed her to the bathroom. *Miranda* requires that an individual be advised of the privilege against self-incrimination and the right to the assistance of counsel prior to questioning when the suspect is subject to interrogation and in custody. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (discussing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Dunkelberger only disputes whether she was in custody, not whether the March 25, 2010, meeting constituted an interrogation.

Regarding custody, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). A suspect is in custody if, considering the totality of the circumstances, " 'a reasonable person in the suspect's position would have understood his situation' to be one of custody." *Griffin*, 922 F.2d at 1347 (quoting *Berkemer v. McCarty*, 468

9

U.S. 420, 442 (1984)). The standard is objective, not subjective. *Berkemer*, 468 U.S. at 442. The Eighth Circuit has announced six common indicia of custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. These indicia are not exhaustive and should not be applied ritualistically. *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005).

Dunkelberger acknowledged that she voluntarily acquiesced to Pons's request for another meeting on March 25, 2010. As discussed above, no strong arm tactics were used and LaFond did not coerce Dunkelberger's statement. The atmosphere of questioning was not police-dominated because LaFond and Pons did not wear police-type clothing but rather wore business attire. They did not have handcuffs or sidearms with them. As DOL investigators, Pons and LaFond did not have the legal authority to place Dunkelberger under arrest and they never indicated to her that they

10

would or could place her under arrest. Dunkelberger concedes that she was never arrested.

Dunkelberger argues that no one ever told her that her participation in the interview was voluntary. She further contends that when she left for a bathroom break, Pons followed her, which shows that the interview was not voluntary.

Dunkelberger drove herself to the meeting on March 25, 2010, and she drove herself home. The conversation centered around Dunkelberger's alleged misuse of Union funds, but "the fact that the purpose of the questioning is to further focus the investigation on the defendant does not weigh heavily in [the custody] analysis." *Griffin*, 922 F.2d at 1348 (internal quotations omitted).

At the top of Dunkelberger's signed statement, she agreed, under penalty of perjury, that "I, Terri Dunkelberger, . . . make the following voluntary statement . . . I understand that I am free to leave the interview, and left the interview for a few minutes." Pons testified that she typed the statement while Dunkelberger was in the room and that the statement was unique to Dunkelberger's situation because it reflected that Dunkelberger did leave the interview for a few minutes to use the restroom. As acknowledged by Dunkelberger, "the most obvious and effective means of demonstrating [s]he has not been taken into custody" is to inform a suspect

11

that her participation is voluntary. *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). Not only did Dunkelberger voluntarily agree to meet Pons and LaFond, but she was also told that her participation was voluntary and she signed a statement to that same effect.

When Dunkelberger went to use the restroom, Pons left a few moments later to also use the restroom. Pons testified that she waited for some time to give Dunkelberger time alone in the restroom. There is no evidence in the record that Pons forced Dunkelberger to go back to the interview room. Instead, when Dunkelberger was finished in the restroom, she voluntarily walked directly back to the interview room. Dunkelberger did not ask for another break during the interview and there is no evidence that she would have been denied her unrestrained freedom of movement during the interview.

Based on an objective view of the evidence, Dunkelberger was not in custody when she signed the statement. Therefore, Pons and LaFond did not have to provide Dunkelberger with *Miranda* warnings and there was no Fifth Amendment violation.

**III.  Dunkelberger's Statement Was Voluntary**

Dunkelberger's third objection is that her confession was involuntary. Due process requires that confessions be voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (explaining that voluntary

confessions may be used against defendants while the use of involuntary confession offends due process). Even if the suspect is not in custody, a statement could still be involuntary in "special circumstances." *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (citations omitted). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225.

On the other hand, " '[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.' " *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). This standard is "very demanding." *Id.* at 726. The appropriate test for determining the voluntariness of a confession is " 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.' " *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)).

Magistrate Judge Simko considered all of the facts and circumstances surrounding Dunkelberger's interview and statement, including that the agents made no threats and did not deceive Dunkelberger, Pons told Dunkelberger that she was free to leave, and the interview was not

13

particularly long. After considering these facts, he ruled that Dunkelberger gave a voluntary statement.

Dunkelberger objects to Magistrate Judge Simko's ruling because the investigatory environment was hostile, and Pons and LaFond coerced her into signing the statement by making deceptive and coercive statements. Specifically, Dunkelberger testified that LaFond told her that if she did not sign the statement, the Union members would learn about it, that Dunkelberger should sign the statement so that they could go home for supper, and that once she did sign, it would all be over.

As stated above, Dunkelberger's version of the events is not credible. Even if Dunkelberger told the truth at the evidentiary hearing, statements by a government agent that they could go home for supper if Dunkelberger signed the statement, that the Union would find out about the situation, and that it would all go away if she signed the statement do not rise to the level of coercion that could overpower Dunkelberger's free will. The Union was already aware of the missing funds because the Union reported the situation to the DOL in February of 2010. A comment about going home to supper is not sufficient to overpower the will of a person who is accused of embezzlement and facing a possible felony conviction.

At the end of the interview, Dunkelberger agreed that Pons could type up a statement, Pons read the statement aloud to Dunkelberger,

Dunkelberger had the opportunity to read over and correct the statement, and she then signed and initialed the statement in all the required places. Dunkelberger's actions show that her signing was a product of free and unconstrained choice. Accordingly, it is

ORDERED that the court adopts the Report and Recommendation of Magistrate Judge John Simko (Docket 19) and, therefore, defendant's motion to suppress (Docket 13) is denied.

Dated November 23, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE